IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROBERT A. CABASUG and JOYCE C. CABASUG, <br><br> Plaintiffs, <br><br> vs. <br><br> CRANE COMPANY, et al., <br><br> Defendants. | CIVIL NO. 12-00313 JMS/BMK <br><br> ORDER ADDRESSING VARIOUS MOTIONS FOR SUMMARY JUDGMENT RAISING ISSUES OF CAUSATION AND THE DUTY TO WARN (DOC. NOS. 674, 676, 678, 683, AND 690) |

## ORDER ADDRESSING VARIOUS MOTIONS FOR SUMMARY JUDGMENT RAISING ISSUES OF CAUSATION AND THE DUTY TO WARN (DOC. NOS. 674, 676, 678, 683, AND 690)

## I. INTRODUCTION

On June 1, 2012, Plaintiffs Robert and Joyce Cabasug ("Plaintiffs") filed this action asserting claims for negligence, strict liability, breach of warranty, loss of consortium, and punitive damages based on a failure to warn theory against twenty-five Defendants that manufactured, sold and/or supplied various products containing asbestos to the United States Navy. As alleged in the Third Amended Complaint ("TAC"), Robert Cabasug ("Cabasug") was exposed to asbestos contained in Defendants' products while working as a pipefitter and nuclear engineer at the Pearl Harbor Naval Shipyard ("PHNS") from 1973 through 2006, causing him to develop mesothelioma and other asbestos-related diseases.

Currently before the court are a number of motions raising interrelated issues regarding causation, including (1) what evidence Plaintiffs must present to raise a genuine issue of material fact that each of Defendant's products was a substantial factor in causing Cabasug's injuries; and (2) whether Defendants may be held liable for asbestos containing replacement parts which they did not themselves place into the stream of commerce.

The court previously determined that maritime law applies to this dispute. *See Cabasug v. Crane Co.*, --- F. Supp. 2d ----, 2013 WL 3855548 (D. Haw. July 25, 2013), Doc. No. 657. Applying maritime law, the court joins those courts that have already addressed these issues and finds that (1) on causation, Cabasug must establish, for each Defendant, a substantial exposure for a substantial period of time to a Defendant's product; and (2) on the duty to warn, a Defendant has no duty to warn regarding asbestos-containing replacement parts that it did not manufacture and/or distribute.

## II. **BACKGROUND**

Cabasug worked at PHNS from 1973 through 2006, and held positions as a pipefitter; pipefitter limited; pipefitter journeyman; nuclear inspector, Code 139; General Engineer, Code 365; and Test Engineer and Risk Control. Plaintiffs asserts that he was exposed to asbestos up until 1986 when he

was promoted to an office job.  *See Cabasug*, 2013 WL 3855548, at *1.

Prior to this promotion, Cabasug asserts that he was exposed to asbestos within PHNS working on various ships and submarines under repair and inside Building No. 4 (Shop 56).  *Id.*  Cabasug asserts that he spent seventy-five percent of his time on ships in dry dock, and explains he was "assigned jobs on these ships that included the repair, fabrication, reinstallation, modification, alteration, and testing of components on the equipment, machinery, and valves." *See, e.g.*, Doc. No. 677-2, Ametek Ex. 2 at 18.  Cabasug recalls working "on a daily basis" with and around a panoply of equipment, machinery, and valves, and recalls seeing the names of Defendants on such products.  *Id.* at 18-19.  Cabasug generally explains his work as follows:

> When we were doing repair and fabricating, we removed a great deal of equipment that required us to remove and replace the exterior insulation, as well as asbestos gaskets and packing.  We removed piping that was integral to turbines, pumps and valves.  Most of the piping had insulation on it.  As part of my job, I also helped the machinists of Shop 38 by removing interferences so that equipment could be removed or worked on.  I worked throughout the ships and submarines.  On the surface ships, I mainly worked in the fire rooms and boiler rooms.  There was little to no ventilation and no exhaust.  Whatever the ship or submarine that I worked on, we worked in very tight spaces with minimal ventilation.

*Id.* at 19.  In total, Cabasug has identified thirty-eight ships and submarines that he

worked on at PHNS.[1]  *See* Doc. No. 608-2, Ex. A.

On January 23, 2012, Cabasug was diagnosed with mesothelioma.

Doc. No. 406-6, Pls.' Ex. D.  On June 1, 2012, Plaintiffs filed this action alleging

claims for negligence, strict liability, breach of warranty, loss of consortium, and

punitive damages against Defendants based on their design, manufacture, sale,

and/or supply of various products containing asbestos to the United States Navy.

The TAC asserts that Defendants:

> sold and supplied certain equipment to the United States
> Navy and [PHNS] and other shipyards, which contained
> asbestos gaskets and/or packing and asbestos packing and
> gaskets were sold by said defendants as spare
> replacement parts with the sale of said equipment and
> which required asbestos insulation, or required other
> asbestos containing parts to function properly, and
> Defendants also sold replacement aftermarket component
> parts to the Navy for use with their equipment, including
> asbestos gaskets and packing which were identical to
> their commercial counterparts.

Doc. No. 661, TAC ¶ 4.  The TAC further asserts:

> Defendants and each of them, negligently designed,
> manufactured, selected materials, assembled, inspected,
> tested, maintained for sale, marketed, distributed, leased,
> sold, recommended and delivered the hereinabove
> described certain asbestos products in such manner so as
> to cause said asbestos products to be in a defective and
> unsafe condition, and unfit for use in the way and manner

---

[1] In this background section, the court outlines only the general facts to provide context to the issues raised.  In its analysis, the court outlines specific facts as to each Defendant.

4

> such products are customarily treated, used and
> employed; and, that said Defendants, and each of them,
> negligently failed to discover said defects and/or failed to
> warn and/or adequately test and give adequate warning of
> known or knowable dangers of asbestos products to users
> of said products of said defects and dangers and/or failed
> to find or use a safe substitute insulating material.

*Id.* ¶ 7.

On July 25, 2013, the court determined that maritime law, not Hawaii substantive law, applies to this dispute. *Cabasug*, 2013 WL 3855548.

From August 28-30, 2013, Cleaver Brooks, Inc. ("Cleaver Brooks"), Ametek, Inc. ("Ametek"), Aurora Pump Company ("Aurora"), and Crane Company ("Crane") filed Motions for Summary Judgment arguing that they are entitled to summary judgment on the issue of causation (whether based on a substantial factor, replacement part, and/or duty to warn theory).[2] *See* Doc. Nos. 674, 676, 678, 690. On August 30, 2013, Plaintiffs filed their Motion for Summary Adjudication on the Duty to Warn Under Maritime Law. Doc. No. 683. On October 4, 2013, Plaintiffs filed an Omnibus Opposition regarding product

---

[2] The William Powell Company ("William Powell") filed a similar Motion for Summary Judgment, Doc. No. 672, which it withdrew. Doc. No. 709. The court also initially set the briefing schedule and hearing date on Viad Corp.'s ("Viad") Motion for Summary Judgment, Doc. No. 694, on this same schedule. Given that Viad raised additional dispositive issues, the court will address its Motion for Summary Judgment (as well as the related Objections to evidence, Doc. Nos. 741-46 and Plaintiffs' Motion to Strike Objections, Doc. No. 753) in the second group of Motions set for hearing on December 23, 2013. Plaintiffs and Viad should come to the December 23, 2013 hearing prepared to argue the issue of successor liability.

exposure and causation, Doc. No. 707, and filed Oppositions to specific Motions

on October 10-15, 2013.  Doc. Nos. 710, 712, 717, 720.  On October 15, 2013,

Defendants Air & Liquid Systems Corp., Grissom Russell Company, Crane,

Cleaver Brooks, Ametek, and Aurora filed Oppositions to Plaintiffs' Motion on the

Duty to Warn.  Doc. Nos. 716, 719, 721, 726, 727, 729.  Replies were filed on

October 22, 2013.  Doc. Nos. 733-38, 741-47.  A hearing was held on November

12, 2013.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of

Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

        "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

7

# IV. __ANALYSIS__

Plaintiffs assert negligence and strict liability claims based on Defendants' failure to warn regarding the dangers of asbestos.  Under either theory of liability, basic maritime tort law requires that Plaintiffs "show that the defendant's action was a 'substantial factor in bringing about [the] harm.'" *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1135 (9th Cir. 1998) (quoting *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir. 1992)); *see also Conner v. Alfa Laval*, 842 F. Supp. 2d 791, 797 (E.D. Pa. 2012) (discussing causation under maritime law for both negligence and strict liability claims); Restatement (Second) of Torts § 431 (1965) (providing that actor's negligent conduct is the legal cause of harm, in part, when "his conduct is a substantial factor in bringing about the harm").  The parties raise several arguments regarding causation, including (1) what evidence Plaintiffs must present to raise a genuine issue of material fact that each of Defendant's products was a substantial factor in causing Cabasug's injuries; and (2) whether Defendants may be held liable for asbestos containing replacement parts which they did not themselves place into the stream of commerce.  The court first determines the proper legal framework for these issues under maritime law, and then addresses the parties' specific arguments as to each Defendant.

8

A.    **Legal Principles Under Maritime Law**

1.    *Causation*

As many courts have recognized, asbestos actions present unique issues for purposes of causation -- asbestos diseases may take decades for the exposure to cause diagnosable effects; there are usually numerous possible sources of asbestos found in the plaintiff's workplace (which may encompass a large area such as a shipyard); and due to the passage of time, a plaintiff may be unable to recall with specificity the asbestos-containing products to which he was exposed. *See, e.g.*, *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1301 (8th Cir. 1993) ("The courts have recognized that, given the nature of asbestos exposure in large industrial settings and the long latency periods for asbestos-related diseases, plaintiffs (especially bystanders) face a formidable task in showing, after many intervening years, exposure to a particular defendant's asbestos product and that exposure's causation of the plaintiff's injuries."). As a result, a plaintiff may not be able to present for each defendant direct evidence establishing that a plaintiff has been exposed to a particular product containing asbestos and that such product was a substantial factor in causing injury.

In recognition of these issues, courts have developed various tests in determining whether a plaintiff's circumstantial evidence raises a genuine issue of

9

material fact that a particular defendant's product was a substantial factor in causing his injuries. The Ninth Circuit has not addressed causation under maritime law in the asbestos context, and the parties dispute what evidence is necessary to raise a genuine issue that each of Defendant's products was a substantial factor in causing Cabasug's injuries. The court therefore considers the various tests adopted by other courts to discern what test best comports with the Ninth Circuit's view under maritime law.

Defendants urge this court to follow *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488 (6th Cir. 2005), the only circuit court to consider causation for asbestos exposure under maritime law. In *Lindstrom*, a merchant seaman who worked in the engine department aboard several vessels brought products liability claims against various manufacturers for compensation for mesothelioma allegedly caused by the many pieces of equipment containing asbestos to which he was exposed. *Lindstrom* explained that a plaintiff must show, "for each defendant, that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Id.* at 492 (citing *Stark v. Armstrong World Indus.*, 21 Fed. Appx. 371, 375 (6th Cir. 2001) (unpublished)). *Lindstrom* explains:

> [W]e have permitted evidence of substantial exposure for
> a substantial period of time to provide a basis for the

10

inference that the product was a substantial factor in causing the injury.  [*Stark*, 21 Fed. Appx.] at 376.  "Minimal exposure" to a defendant's product is insufficient.  *Id.*  Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient.  *Id.*  Rather, where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show "'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'"  *Id.* (quoting *Harbour v. Armstrong World Indus., Inc.*, 1991 WL 65201, at *4 (6th Cir. Apr. 25, 1991)).  In other words, proof of substantial exposure is required for a finding that a product was a substantial factor in causing injury.

*Id.*

Applying this "substantial exposure" framework, *Lindstrom* granted summary judgment to Garlock Sealing Technologies ("Garlock"), where (1) Garlock manufactured both asbestos-containing and non-asbestos containing products; (2) the plaintiff failed to identify Garlock as a manufacturer of sheet packing material aboard the vessels and did not identify any exposure to asbestos in connection with Garlock's products; and (2) other witness testimony established that some Garlock sheet packing contained asbestos, yet the witness could not affirm whether all of the Garlock sheet packing on the vessel on which the plaintiff worked contained asbestos.  *Id.* at 497.  *Lindstrom* determined that summary judgment was appropriate because the plaintiff "did not specifically testify

regarding Garlock at all, and his other two deponents admitted that they could not tell whether any sheet packing material handled by [the plaintiff] contained asbestos." *Id.* at 498.  Thus, there was no evidence supporting the reasonable inference that the plaintiff had substantial exposure to Garlock's asbestos-containing products.

Since *Lindstrom*, the MDL asbestos action has adopted and applied this standard in asbestos cases applying maritime law.  *See, e.g.*, *Hall v. A.W. Chesterton Co.*, 2013 WL 2477160 (E.D. Pa. May 7, 2013); *Bolton v. Air & Liquid Sys. Corp.*, 2013 WL 2477169 (E.D. Pa. Apr. 30, 2013); *Pace v. 3M Co.*, 2013 WL 1890341 (E.D. Pa. Apr. 22, 2013).  *Lindstrom* also appears in line with many state court decisions, requiring that there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked (*i.e.*, the "regularity, frequency, and proximity" test).[3]

A review of *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156

---

[3] *See, e.g.*, *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 (4th Cir. 1995) (North Carolina law); *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1303 (8th Cir. 1993) (Arkansas law); *Slaughter v. S. Talc Co.*, 949 F.2d 167, 171 (5th Cir. 1991) (Texas law); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 367 (3d Cir. 1990) (Pennsylvania law); *Menne v. Celotex Corp.*, 861 F.2d 1453, 1464 (10th Cir. 1988) (Nebraska law); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986) (Maryland law); *Phillips 66 Co. v. Lofton*, 94 So.3d 1051, 1063 (Miss. 2012) (Mississippi law); *James v. Bessemer Processing Co.*, 714 A.2d 898, 911 (N.J. 1998) (New Jersey law); *Henderson v. Allied Signal, Inc.*, 644 S.E.2d 724, 727 (S.C. 2007) (South Carolina law); *see also* David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 Brook. L. Rev. 51, 55-56 n.16 (2008) (noting that this standard has been adopted by statute in Florida, Georgia, and Ohio).

(4th Cir. 1986), which is widely cited for the "regularity, frequency, and proximity" test, shows certain parallels with *Lindstrom*. *Lohrmann* explains that its test prevents a plaintiff from defeating summary judgment merely by "present[ing] any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace," which would be contrary to the requirement that a plaintiff establish that defendant's product was a substantial factor in bringing about the harm. *Id.* at 1162. Rather, requiring evidence of the frequency, regularity, and proximity of exposure to a defendant's asbestos-containing product reflects the substantial factor causation requirement by mandating that a plaintiff "prove more than a casual or minimum contact with the product." *Id.* *Lohrmann* reasoned that this rule is reasonable in light of the substantial factor causation requirement, combined with the "unusual nature of the asbestosis disease process, which can take years of exposure to produce the disease." *Id.* Also, given the size of the workplace at issue (a shipyard), "the mere proof that the plaintiff and certain asbestos products are at the shipyard at the same time, without more, does not prove exposure to that product." *Id.*

Despite the numerous courts that have adopted the frequency, regularity, and proximity test, cases do not apply this test by rote and its application depends on the particular facts presented. Indeed, *Lohrmann* explained

that this test was "in keeping with the opinion of the plaintiff's medical expert who

testified that even thirty days exposure, more or less, was insignificant as a causal

factor in producing the plaintiff's disease." *Id.* at 1163. And although there was

testimony that some of defendants' products were used in the shipyard, there was

no testimony establishing that the plaintiff was actually exposed to them. *Id.* at

1163-64. In comparison, *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992)

(applying Illinois law), acknowledged that the frequency and regularity prongs

"become less cumbersome when dealing with cases involving diseases, like

mesothelioma, which can develop after only minor exposures to asbestos fibers."

*Id.* at 420 (citations omitted); *see also Jackson v. Anchor Packing Co.*, 994 F.2d

1295, 1303 (8th Cir. 1993) (applying Arkansas law and acknowledging that a

"plaintiff's evidence of 'fiber drift' may be used to widen the area of probable

exposure surrounding the plaintiff's work station," effectively widening the

proximity prong of the analysis (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d

360, 367 (3d Cir. 1990))). Finally, *Slaughter v. Southern Talc Co.*, 949 F.2d 167

(5th Cir. 1991) (applying Texas law), summarized the test as requiring a plaintiff

simply to "prove that, more probably than not, he actually breathed asbestos fibers

originating in defendants' products," and determined that the plaintiff had

established a genuine issue of fact where he asserted that defendant's products had

14

been used "all over the plant" yet could not specifically show their use near the plaintiff's work area. *Id.* at 171-72.

On the other side of the spectrum, Plaintiffs argue that the Ninth Circuit would adopt the test outlined in *Lockwood v. AC&S, Inc.*, 744 P.2d 605 (Wash. 1987) (en banc), which held that the plaintiff established his prima facie case by presenting evidence that the defendant's asbestos-containing products were in the same workplace, that asbestos dust can remain in the air and drift with air currents for a long period of time, and that exposure to asbestos has a cumulative effect in contributing to asbestosis. *Lockwood* explained that even though the plaintiff did not work directly with the defendant's product, "it is reasonable to infer that since the product was used on that ship when [the plaintiff] worked there, [the plaintiff] was exposed to it." *Id.* at 613. Combined "with the expert testimony that all exposure to asbestos has a cumulative effect in contributing to the contraction of asbestosis," *Lockwood* held that it would be reasonable for a jury to infer that the plaintiff's exposure was a proximate cause of his injury. *Id.*

Since *Lockwood*, *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806 (9th Cir. 1992), predicted that the Hawaii courts would adopt this approach in light of Hawaii's policy of providing "the maximum possible protection that the law can muster against dangerous defects in products." *Id.* at 817-18. With that said,

15

however, *Lockwood* has been criticized as creating a "'non traditional' result in finding that the mere presence of the defendant's product in the workplace coupled with 'fiber drift' evidence was sufficient to justify submission of the issue of causation to the jury." *See Robertson*, 914 F.2d at 381. Rather, "the vast majority of the cases addressing circumstantial evidence in the context of asbestos litigation requires more, *i.e.*, some concrete demonstration of a link between the alleged injury and a defendant's particular asbestos-containing product." *Id.* at 382. *See also Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1481 (11th Cir. 1985) (declining to "create a judicial presumption that a plaintiff was exposed to the asbestos in a defendant's products by simply showing that he worked at a job site at a time when the defendant's asbestos-containing products were used").

        What this review of the caselaw establishes is that courts have taken different views -- based on the particular evidence presented and/or in recognition of the unique issues presented of asbestos products liability cases -- of what evidence is sufficient to raise a genuine issue of material fact as to causation.[4] With this background, the court's task is to determine the appropriate framework

---

        [4] Indeed, even *Lockwood* recognized that "the sufficiency of the evidence of causation will depend on the unique circumstances of the case," including evidence of the plaintiff's proximity to the asbestos when exposure occurred, the expanse of the workplace where asbestos fibers were released, the extent of time the plaintiff was exposed, the types of asbestos products to which the plaintiff was exposed, and how those products were handled, and evidence of medical causation. 744 P.2d at 613.

under maritime law, the very purpose of which is to create "a uniform and specialized body of federal law" applicable to the maritime shipping industry.  *See Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir. 1975); *see also Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 709 F.3d 1055, 1061 (11th Cir. 2013) ("When admiralty jurisdiction is invoked, a uniform body of federal maritime law applies." (citations omitted)).  Indeed, as the Supreme Court has long-recognized:

> One thing . . . is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country.  It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.

*Am. Dredging Co. v. Miller*, 510 U.S. 443, 451 (1994) (quoting *The Lottawanna,* 21 Wall. 558, 575 (1875)).

> *Lindstrom* and the MDL action have spoken as to how causation is determined under maritime law, and their view is generally consistent with a majority of state law cases addressing this issue.  *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 878 (1997) (explaining that maritime law "'is an amalgam of traditional common-law rules, modifications of those rules, and newly

17

created rules,' drawn from both state and federal sources" (citing *East River S.S.*

*Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 865 (1986)). And the court

further finds that this view is consistent with the Ninth Circuit's guidance on tort

law in the maritime context. The ultimate focus of the analysis under maritime law

is whether the plaintiff has shown "that the defendant's action was a 'substantial

factor in bringing about [the] harm,'" *Sementilli*, 155 F.3d at 1135 (quoting

*Benefiel*, 959 F.2d at 807), and a plaintiff must establish a genuine issue of material

fact as to this element to survive summary judgment. Thus, to the extent that

*Lockwood* "eased the strict requirements" of causation due to the problems with

product identification, *see* 744 P.2d at 612 n.6, the court believes that the Ninth

Circuit would reject such formulation as counter to the substantial factor

requirement, and counter to the established caselaw under maritime law requiring

that Plaintiffs come forward with evidence raising a genuine issue of material fact

that Cabasug was exposed to a particular Defendant's product and that such

exposure was a substantial factor in causing Plaintiffs' injuries.

   The court therefore finds that the Ninth Circuit, in applying maritime

law, would follow *Lindstrom's* guidance that to survive summary judgment

Plaintiffs must come forward with evidence raising a genuine issue of material fact

that (1) Cabasug was exposed to each Defendant's product(s); and (2) such product

was a substantial factor in causing Cabasug's injury.  *See Lindstrom*, 424 F.3d at

492.  Thus, "a mere showing that defendant's product was present somewhere at

plaintiff's place of work is insufficient."  *Id.*  Rather, Plaintiffs must show "a high

enough level of exposure that an inference that the asbestos was a substantial factor

in the injury is more than conjectural."  *Id.*

Determining what level of exposure is necessary to raise a genuine

issue of material fact will ultimately depend on the particular facts as to the

particular Defendant.  Put simply, context matters -- the parties should not interpret

the court's adoption of *Lindstrom* as creating some sort of artificial check-list

regarding what evidence is necessary to defeat summary judgment as to causation

in a maritime asbestos product liability case.  Rather, the court's analysis will be

guided by the particular facts to determine whether Plaintiffs have presented

evidence to support a reasonable inference that the asbestos from a particular

Defendant's product was a substantial factor in the injury.[5]

For example, evidence that Cabasug worked on a vessel in which a

---

[5] A reasonable inference may be the product of either direct or circumstantial evidence.  Circumstantial evidence is sufficient to withstand summary judgment, particularly where direct proof is difficult to obtain.  *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1097 (9th Cir. 2010) *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 131 S. Ct. 1812 (2011) *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011) (involving awareness of a defendant's serious medical need); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (involving securities fraud); *Baxter v. MCA, Inc.*, 812 F.2d 421 (9th Cir. 1987) (involving copyright infringement).

Defendant's products were present, on its own, is insufficient to raise a genuine

issue of material fact that Cabasug was exposed to such products.  *See id.*

Plaintiffs may, however, raise a genuine issue of material fact by presenting direct

evidence that Cabasug worked on (or, depending on the particular fact, near) the

asbestos-containing components of specific products.  Alternatively, Plaintiffs may

present circumstantial evidence of exposure by presenting evidence that the

Defendant's products were prevalent on the vessels on which Cabasug worked and

that Cabasug regularly worked on those types of products.  In this latter case,

evidence of regarding the prevalence of a Defendant's product, combined with

evidence of Cabasug's regular duties, may support the reasonable inference that

Cabasug worked on a particular product.  Under either alternative, however, the

court rejects Defendants' arguments that Plaintiffs must present direct evidence

that Cabasug recalled working on a particular product by the Defendant and

recalled the particular vessel upon which it was installed.

      As to whether a Defendant's product was a substantial factor in

causing Plaintiffs' injuries, the court again stresses that context matters.

Specifically, although *Lindstrom* instructs that "minimal exposure is insufficient,"

*id.*, what exposure constitutes "minimal" as opposed to "substantial" exposure

depends on the particular circumstances of each case.  For example, where

Plaintiffs have raised a genuine issue that Cabasug was exposed to the asbestos components of a product in the course of his regular duties, expert testimony that *every* asbestos exposure increases the individual's risk of developing mesothelioma may support the reasonable inference that asbestos from the Defendant's product was a substantial factor in causing Plaintiffs' injuries.

In providing these examples, the court stresses that they are not meant to be read as hard rules regarding when a plaintiff may establish a reasonable inference of substantial exposure. Rather, each case depends on the particular facts presented, and the court will consider both direct and circumstantial evidence in determining whether Plaintiffs have raised a genuine issue of material fact.

### 2. *Duty to Warn*

Where a defendant provides a product that is unreasonably dangerous (such as a product including asbestos-containing components), the duty to warn arises. The Restatement (Second) of Torts § 402A (1965) (the "Restatement"), which both the Supreme Court and Ninth Circuit have cited in maritime products liability cases, *see Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879 (1997); *Pan-Alaska Fisheries, Inc. v. Marine Const. & Design Co.*, 565 F.2d 1129, 1134 (9th Cir. 1977), provides that liability attaches to "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or

21

to his property."

> This duty to warn extends to all components of the product that a defendant places into the stream of commerce.  *See* Restatement § 402A cmt. h ("The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packed."); *see also Exxon Shipping Co. v. Pac. Res., Inc.*, 789 F. Supp. 1521, 1526 (D. Haw. 1991) (explaining that under maritime law, strict liability is imposed "upon a manufacturer or an assembler who incorporates a defective component part into its finished product and places the finished product into the stream of commerce").

> Asbestos may be incorporated into a defendant's products in several potential ways -- for example, a defendant may supply and install the asbestos component contained in the final product; a defendant may specifically design its product to contain specific asbestos components, but those asbestos components are incorporated into the product after it leaves the defendant's possession; or, as a replacement part, where the asbestos component is supplied by the same defendant or a different manufacturer (regardless of whether the defendant supplied the original asbestos component or designed its product to contain

asbestos components).  The pending Motions address replacement parts only, many

supplied years (if not decades) after the original manufacture date.  And this leads

to what the parties dispute -- whether a defendant has a duty to warn where a

defendant did not provide the replacement asbestos components to which the

plaintiff was exposed.  The court now answers that question.

Although the Ninth Circuit has not addressed this issue under

maritime law, the Restatement, as provided above, suggests that a defendant is not

liable for third-party replacement parts -- instead, it is liable for only *its* products.

*See also* 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 5-7 (5th ed.

2011) (explaining that the Restatement "requires the plaintiff to prove: (1) that the

defendant sold or manufactured the product; (2) that the product was unreasonably

dangerous or was in a defective condition when it left the defendant's control; and

(3) that the defect resulted in injury to the plaintiff.").  More definitively answering

this question, however, is the MDL court in *Conner*, which persuasively analyzed

both *Lindstrom* and several state law cases to hold that under maritime law, a

defendant does not have a duty to warn regarding replacement parts it did not place

into commerce.

*Conner* started its analysis with *Lindstrom*, which although did not

expressly address the duty to warn, is nonetheless instructive for its determination

23

that a manufacturer is not liable for a third party's replacement asbestos products. *See Lindstrom*, 424 F.3d at 493-97.  For example, although manufacturer Henry Vogt admitted that its valves and gaskets originally included asbestos components, the undisputed evidence established that these components were replaced twice a year, Henry Vogt did not supply any of these replacement parts, and the plaintiff boarded the ship four years after the Henry Vogt equipment was installed on the ship.  *Lindstrom* concluded that "there was insufficient evidence to connect [the plaintiff] with any Henry Vogt product or to connect a Henry Vogt product with asbestos that caused [the plaintiff's] illness," where the plaintiff did not handle the original packing or gasket material, and "any asbestos that he may have been exposed to in connection with a Henry Vogt product would be attributable to some other manufacturer."  *Id.* at 495.  Thus, *Lindstrom* held that "Henry Vogt cannot be held responsible for material 'attached or connected' to its product on a claim of a manufacturing defect."  *Id.* (citing *Stark*, 21 Fed. Appx. at 381, and *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 715 (5th Cir. 1986) ("The component part manufacturer is protected from liability when the defective condition results from the integration of the part into another product and the component part is free from defect.")).

   *Conner* outlined that *Lindstrom's* determination that a manufacturer is

liable only for its products is consistent with several state court decisions addressing replacement parts, including *Simonetta v. Viad Corp.*, 197 P.3d 127 (Wash. 2008) (en banc); *Braaten v. Saberhagen Holdings*, 198 P.3d 493 (Wash. 2008) (en banc); and *O'Neil v. Crane Co.*, 266 P.3d 987 (Cal. 2012).

For example, *Simonetta* affirmed summary judgment against a former Navy machinist who brought product liability claims where the defendant's product, an evaporator, did not itself contain asbestos, but required insulation to function properly which was provided by a third party and replaced regularly. 197 P.3d at 129-31. *Simonetta* viewed the asbestos insulation and not the evaporator as the harmful product, and concluded that the duty to warn is "limited to those in the chain of distribution of the hazardous product." *Id.* at 134, 137.

*Braaten* further extended this reasoning in determining that a defendant does not have a duty to warn regarding asbestos in replacement packing and gaskets that the defendants did not manufacture, sell or supply. 198 P.3d at 495. *Braaten* reasoned that "[t]he defendants did not sell or supply the replacement packing or gaskets or otherwise place them in the stream of commerce, did not specify asbestos-containing packing and gaskets for use with their valves and pumps, and other materials could have been used." *Id.* at 495-96. Thus, *Braaten* held that "a manufacturer does not have an obligation to warn of the

dangers of another manufacturer's product." *Id.* at 504.

Finally, *O'Neil* similarly held that even where Crane originally used asbestos in its valves and packing, it did not have a duty to warn where these parts were later replaced by components from other manufacturers. *O'Neil* explained that California law has "never held that a manufacturer's duty to warn extends to hazards arising exclusively from *other* manufacturer's products." 266 P.3d at 997. Although Crane gave no warning regarding the asbestos components originally included in its products, *O'Neil* determined that Crane did not have a continuing duty to warn regarding replacement parts it did not manufacture given that "[n]o case law . . . supports the idea that a manufacturer, after selling a completed product to a purchaser, remains under a duty to warn the purchaser of potentially defective additional pieces of equipment that the purchaser may or may not use to complement the product bought from the manufacturer." *Id.* at 998 (quoting *In re Deep Vein Thrombosis*, 356 F. Supp. 2d 1055, 1068 (N.D. Cal. 2005)). *O'Neil* concluded that "expansion of the duty of care as urged here would impose an obligation to compensate on those whose products caused the plaintiffs no harm. To do so would exceed the boundaries established over decades of product liability law." *Id.* at 1007.

*Conner* explained that these cases determining that manufacturers can

be liable only for harm caused by their own products and not those of others is

confirmed by the policy motivating products liability law:

> Indeed, products-liability theories rely on the principle that a party in the chain of distribution of a harm-causing product should be liable because that party is in the best position to absorb the costs of liability into the cost of production:
>
>> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; *that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained*; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.
>
> Restatement (Second) of Torts § 402A, cmt. c (1965) (emphasis added).
>
>> And various courts that have considered the issue have similarly noted that this policy weighs against holding manufacturers liable for harm caused by asbestos products they did not manufacture or distribute because those manufacturers cannot account for the costs of liability created by the third parties' products.

842 F. Supp. 2d at 800-01 (citing various cases); *see also Faddish v. Buffalo*

*Pumps*, 881 F. Supp. 2d 1361, 1372 (S.D. Fla. 2012) (adopting the "bare metal" defense under Florida law and explaining that "the duty to act is limited to entities within a product's chain of distribution on theory that these are the entities best motivated and capable of controlling the risk").  Thus, considering this caselaw and these policy considerations, *Conner* held "that, under maritime law, a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute."  842 F. Supp. 2d at 801.

The court finds this reasoning sound and believes the Ninth Circuit would determine that under maritime law, a manufacturer is not liable for replacement parts that it did not place into the stream of commerce, whether the manufacturer's product originally contained asbestos components or was designed to include asbestos components.  As outlined in *Conner*, this rule is in line with the Restatement, which suggests that the duty to warn is limited to entities within a product's chain of distribution because such entities are in the best position to absorb the costs of such warnings into the cost of the replacement parts.  *Id.* Following this reasoning, a manufacturer should not be held liable for replacement parts provided by third parties (often provided years later).  And as with the causation analysis above, the court believes that the Ninth Circuit would also find

*Lindstrom* and *Conner* persuasive in ensuring the creation of a uniform body of

law to govern maritime actions.

In opposition, Plaintiffs criticize *Lindstrom* (and therefore *Conner's*

reliance upon it) because *Lindstrom* (1) did not rely upon the Restatement;

(2) relied only upon *Stark*, an unpublished case, to determine maritime law;

(3) extended *Stark* beyond the facts *Stark* addressed; and (4) limited its holding to

causation and did not address the duty to warn.  Doc. No. 683, Mot. at 16-17.

These criticisms lack merit.  *Lindstrom* does not conflict with the Restatement, and

its reliance on *Stark* is unsurprising given that its facts were analogous and *Stark*

also addressed maritime law.  Further, although *Stark* is unpublished, *Lindstrom*

ultimately made its own determination as to the law, and its reasoning, as shown in

*Conner* and subsequent cases, is well-supported.  And finally, *Lindstrom* clearly

addressed whether a defendant is liable for replacement parts, determining that a

defendant cannot be held responsible for the asbestos contained in another's

products.  424 F.3d at 496.  This is the case, whether based on the reasoning that a

defendant is not the cause of the injury where it did not supply the asbestos, or that

a defendant has no duty to warn regarding products it did not supply.  In other

words, both *Lindstrom* and *Conner* stem from the same legal principle that a

defendant is not liable for components outside its chain of distribution.[6]

In further opposition, Plaintiffs seemingly invite this court to ignore *Lindstrom* and *Conner* and follow the various (mostly state law) cases cited by Plaintiffs. *See generally* Doc. No. 683. There is certainly no lack of caselaw addressing the duty to warn and asbestos product liability, but Plaintiffs can hardly suggest that *Lindstrom* and *Conner* are outliers in their conclusions where they too cited state law cases in support of their analyses. And the facts of *Conner* and *Lindstrom* are analogous to this action, whereas Plaintiffs' cases mostly address very different facts such that application of their holdings to this case is tenuous at best.[7] Indeed, at the November 12, 2013 hearing, the court requested Plaintiffs to

---

[6] Plaintiffs further argue that *Conner* extended *Braaten* and *O'Neil* beyond their holdings because neither case addressed the situation where the defendant's product required the use of asbestos and/or the defendant specified the use of asbestos. Doc. No. 683-1, Pls.' Mot. at 18. Nothing prevented *Conner* from extending their reasoning to such cases, and *Conner's* reasoning is in line with *Lindstrom* and the Restatement. And in any event, as provided above, the court addresses only the issue of replacement parts at this time.

[7] *See, e.g.*, *Macias v. Saberhagen Holdings, Inc.*, 282 P.3d 1069, 1076 (Wash. 2012) (determining under Washington law that respirator manufacturer had a duty to warn where the respirators were "specifically designed to and intended to filter contaminants from the air breathed by the wearer, including asbestos, welding fumes, paint fumes, and dust," and distinguishing *Simonetta* and *Braaten* on the basis that their products were not "designed as equipment that by its very nature would necessarily involve exposure to asbestos"); *In re Asbestos Products Liab. Litig. (No. VI)*, 2011 WL 5881008, at *1 n.1 (E.D. Pa. July 29, 2011) (determining under Pennsylvania law that Ford had a duty to warn regarding asbestos-containing brake pads on vehicles); *Shields v. Hennessy Indus., Inc.*, 140 Cal. Rptr. 3d 268, 280 (Cal. App. 2012), as modified (May 3, 2012) (determining under California law on motion for judgment on the pleadings that duty was sufficiently pled where the "sole intended use" of defendants' product, a grinder for asbestos-containing brake shoe linings, "was for an activity known to [the

(continued...)

identify cases under maritime law addressing the duty to warn for third-party components, and the only case remotely on point is *Kummer v. Allied Signal, Inc.*, 2008 WL 4890175 (W.D. Pa. Oct. 31, 2008), which denied summary judgment to a turbine manufacturer who did not include any asbestos with its turbine, but which specifically designed the turbine to be insulated with asbestos.[8]  *Id.* at *3-4.

---

[7](...continued)
defendant] to pose an unreasonable risk of harm, and using these facts to distinguish the case from *O'Neil*).

Certainly, asbestos cases exist that have determined, based on the particular state law at issue, that a duty to warn exists under circumstances similar to those presented here.  *See, e.g.*, *Chicano v. Gen. Elec. Co.*, 2004 WL 2250990, at *6 (E.D. Penn. Oct. 5, 2004) (determining that turbine manufacturer had a duty to warn where it designed and knew that its turbine would be insulated with asbestos, even if the manufacturer itself did not supply or insulate the turbine with asbestos).  The court is not applying state law, however, and the court finds the reasoning of *Conner* and *Lindstrom* persuasive for all the reasons explained above.

[8]  At the November 12, 2013 hearing, Plaintiffs also identified *Emerson G.M. Diesel, Inc. v. Alaskan Enter.*, 732 F.2d 1468 (9th Cir. 1984), *Exxon Shipping Co. v. Pacific Resources, Inc.*, 789 F. Supp. 1521 (D. Haw. 1991), and *Conticarriers & Terminals, Inc. v. Borg-Warner Corp.*, 593 F. Supp. 400 (E.D. Mo. 1984), as establishing a duty to warn under maritime law.  Contrary to Plaintiffs' argument, these cases are not helpful.  These cases concern a defect in the characteristic of the defendant's product and not a third-party replacement part.

For example, *Emerson* did not address replacement parts at all, instead determining that the defendant was liable for a defective hose it supplied which caused overheating of an engine.  732 F.2d at 1475.  The only discussion even arguably relevant to the replacement part issue is dicta in which *Emerson* asserts that even if the defendant did not supply the hose, it would be liable for shipping separately a temperature-sensing device without instructions warning the purchaser to install it because this device could have prevented the damage.  *Id.*  Even under this alternative, the product at issue was the defendant's and not a third party's.

*Exxon* is a little closer -- it determined that a negligence claim could stand against the supplier of a chafe chain that broke, where it was unclear whether the particular chain came from the supplier or a third party.  789 F. Supp. at 1528.  *Exxon* allowed this claim based on facts that (1) the supplier had a duty to conduct tests on the chain based on contract, (2) the tests may have revealed the defects in both the supplier and third party chains, and (3) the plaintiff purchased the second chain from the third party by relying on the supplier's determination that the third party was an appropriate supplier.  *Id.* at 1528-29.  Plaintiffs do not assert that such facts exist

(continued...)

*Kummer* is not binding on this court and to the extent it conflicts with *Conner* and

*Lindstrom*, the court rejects it.  Plaintiffs' cases therefore fail to sway the court that

the Ninth Circuit would eschew the developed caselaw addressing the duty to warn

under maritime law.

In sum, the court agrees with *Conner* and *Lindstrom*, and therefore

holds that under maritime law, a manufacturer is not liable for harm caused by, and

owes no duty to warn of the hazards inherent in, asbestos-containing replacement

parts that the manufacturer did not manufacture or distribute.

## B.  Application

Based on the principles outlined above, a plaintiff establishes

causation under maritime law by showing, for each defendant, that he was exposed

to the defendant's product, and the product was a substantial factor in causing the

injury he suffered.  Further, where the asbestos-containing components of a

defendant's product have been replaced, a plaintiff must establish that the

─────────────────

[8](...continued)
here.
    Finally, *ContiCarriers* determined that manufacturers of rubber-lined bearings breached a
duty to warn customers about the dangers of using dry ice to shrink the bearings for installation,
which caused the rubber to crack.  593 F. Supp. at 402.  *ContiCarriers* does not address
replacement parts, and is otherwise wholly distinguishable -- as *Conner* explains, the failure to
warn in *ContiCarriers* proximately caused the damage to the bearings, whereas Plaintiffs in this
action allege that asbestos-containing components caused harm to Plaintiffs.  *See Conner*, 842 F.
Supp. 2d at 802.  And even if *ContiCarriers'* holding could be extended to personal injury as in
this case, again, it is not persuasive to the issue of replacement parts and otherwise is not binding
on this court.

defendant placed those replacement parts into the stream of commerce.  The court addresses these elements as argued in the various pending Motions.

### 1. *Plaintiffs' Motion for Summary Adjudication on the Duty to Warn Under Maritime Law, Doc. No. 683*

Plaintiffs' Motion for Summary Adjudication on the Duty to Warn Under Maritime Law asks the court to make the legal determination that a defendant has a duty to warn so long as it "knew or specified or designed asbestos components and/or it was known that asbestos exposure would occur in the inevitable maintenance and repair of its equipment."  Doc. No. 683, Pls.' Mot. at 3. This Motion, seeking a legal determination on the duty to warn, places the proverbial cart before the horse -- the duty to warn is only an issue if Plaintiffs first establish that Cabasug was exposed to asbestos attributable to a particular Defendant's product.  Rather, the court finds that a Defendant's duty to warn is best addressed in context of the particular facts presented as to each Defendant in context of each of their Motions addressed below.  The court therefore DENIES Plaintiffs' Motion, Doc. No. 683, but will consider its arguments in the context of specific motions for summary judgment.[9]

---

[9]  As a result, the court further DEEMS MOOT Crane's Objections to various of Plaintiffs' exhibits in support of their Motion, Doc. No. 723.

### 2.    *Ametek's Motion for Summary Judgment, Doc. No. 676*

Plaintiffs assert claims against Ametek as the successor-in-interest to

Schutte & Koerting Company ("S&K"), which as alleged in the TAC, supplied to

PHNS various products containing asbestos gaskets and/or packing, and/or

asbestos-containing replacement parts for this equipment.  Doc. No. 661, TAC ¶ 4.

Ametek argues that summary judgment should be granted on Plaintiffs' claims

because S&K did not supply or manufacture any asbestos-containing components

that may have been used in conjunction with its products.

Viewing the facts in a light most favorable to Plaintiffs, the court

finds that Plaintiffs have established a genuine issue of material fact that Cabasug

worked on S&K combined exhaust and relief valves and desuperheaters.

Specifically, Cabasug testified that he worked on (1) S&K combined exhaust and

relief valves "routinely and regularly" by replacing their gaskets and packing, Doc.

No. 713-18, Ametek Ex. E at 393-94; and (2) S&K desuperheaters by removing the

bonnets and replacing the gaskets.  *Id.* at 401.  According to Plaintiffs' expert,

Andrew Ott,[10] S&K provided external desuperheaters to eight vessels on which

---

[10]  Although Ametek and other Defendants generally object to the Ott Declarations on the
basis that he is unqualified to assess the hazards of asbestos and that certain of his opinions are
"based on rank speculation," *see, e.g.*, Doc. No. 736, Ametek Reply at 12, such generalized
objection is ultimately unhelpful.

Specifically, to the extent Defendants argue that the Ott Declarations are not admissible
(continued...)

34

Cabasug worked, and auxiliary exhaust and relief valves "for a major portion of Navy steam ships of the period."  Doc. No. 713-1, Ott Decl. ¶¶ 17, 22.

Plaintiffs have not established, however, that Cabasug was exposed to S&K air ejectors, distilling plant air ejector condensers, sea water heaters, and hydraulic trip valves, which Ott identified as being located on a total of eighteen Cabasug vessels.  *See id.* ¶¶ 18-21.  Plaintiffs came forward with no evidence suggesting that Cabasug worked on sea water heaters or hydraulic trip valves, and the mere fact that these products were on the same vessels as Cabasug is

---

[10](...continued)

pursuant to Federal Rule of Evidence 702, the parties have not briefed the issue in anything more than a cursory way as part of their summary judgment arguments, and the court declines to resolve the expert admissibility issues on the record before it.  *See Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("We conclude, therefore, that at the junction where *Daubert* intersects with summary judgment practice, *Daubert* is accessible, but courts must be cautious -- except when defects are obvious on the face of a proffer -- not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("Given the 'liberal thrust' of the federal rules it is particularly important that the side trying to defend the admissibility of evidence be given an adequate chance to do so.") (internal citation omitted).

And to the extent Defendants argue that Ott's opinions are not supported by evidence, Ott cites to evidentiary support for many of them.  In any event, the court need not address every opinion offered by Ott in addressing the issues raised by the parties.  Rather, the court cites to those portions of the Ott Declarations where relevant to the court's determination and supported by evidence.  The court does not rely on those portions of the Ott Declarations that offer no basis for his opinions.  *See Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007) (explaining that even an expert opinion requires a factual basis for any opinion offered in an affidavit); *United States v. Rushing,* 388 F.3d 1153, 1156 (8th Cir. 2004) ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable"); *Guidroz-Brault v. Mo. Pac. R. Co.,* 254 F.3d 825, 831 (9th Cir. 2001) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts." (citation omitted)).

35

insufficient to raise a genuine issue of material fact.  *See Lindstrom*, 424 F.3d at 492.

Further, although Cabasug testified that he generally worked on distilling plant air ejector condensers, Doc. No. 718-18, Pls.' Ex. E at 373-76, it is mere speculation whether Cabasug worked on S&K distilling plant air ejector condensers where (1) he did not identify the manufacturer of these air ejector condensers, *id.*; (2) Ott asserts that this S&K equipment was aboard only six of the thirty-eight vessels on which Cabasug worked, Doc. No. 713-1, Ott Decl. ¶ 19; and (3) Plaintiffs provide no details regarding the total number of distilling plant air ejector condensers on each vessel and/or the other manufacturers who provided this equipment.  Without such information, the court is left to speculate whether Cabasug *might* have come into contact with an air ejector condenser supplied by S&K.  Finally, as to air ejectors, Cabasug testified that he worked on Foster Wheeler air ejectors, and did not mention S&K.  *See* Doc. No. 713-18, Pls.' Ex. E at 291-293.  Thus, the court finds that Plaintiffs have established a genuine issue of material fact that Cabasug worked on only S&K combined exhaust and relief valves and desuperheaters.

As to the desuperheaters and combined exhaust and relief valves, the evidence does not establish that S&K included any asbestos-containing

36

components with these products.  First, it is undisputed that S&K did not

manufacture or supply exterior thermal insulation, much less any external

insulation that included asbestos.  Doc. No. 677, Ametek CSF ¶ 19.  Further,

Richard Moore, a former S&K lead engineer for the valve group, asserts that S&K

"did not manufacture or supply asbestos to the Navy and did not use raw asbestos

in the manufacture of its products.  To the extent that any [S&K product] contained

asbestos, it did so because one of its components, manufactured by another entity,

contained asbestos."  Doc. No. 677-7, Moore Decl. ¶ 17.  And although Ametek's

corporate witness seemed to contradict Moore by admitting that S&K "did sell

certain products that may have included asbestos-containing components, such as

gaskets and packing," *see* Doc. No. 713-14, Pls.' Ex. A at 98, there is no evidence

supporting a reasonable inference that S&K manufactured or supplied any asbestos

components contained in desuperheaters and combined exhaust and relief valves

for the vessels on which Cabasug worked.

Rather, the only evidence Plaintiffs have presented are (1) Ott's

assertion that "[m]ost equipment provided by [S&K] incorporated asbestos gaskets

that were routinely removed and replaced during the overhaul and repair of their

equipment," Doc. No. 713-1, Ott Decl. ¶ 29; and (2) an S&K technical manual

titled "Combined Exhaust and Relief Valves for Auxiliary Steam Turbines and

Port Feed Pump," which lists the building yard as Bethlehem Sparrows Point Shipyard ("BSPS"), provides under "vessels applicable" "AE 23-25," and indicates that some gaskets are comprised of compressed asbestos. *See* Doc. No. 713-19, Pls.' Ex. F at 3273, 3281, p. 2 (listing material for gasket as "comp. asb."). This evidence does not support the reasonable inference that the S&K equipment Cabasug that worked on contained asbestos components -- Ott provides no basis for his bare assertion that S&K products, and in particular those that Cabasug worked on, included asbestos, and Plaintiffs have failed to explain whether and how this technical manual applies to any vessels at PHNS, much less the combined exhaust and relief valves on which Cabasug worked.

At the November 12, 2013 hearing, Plaintiffs again failed to identify any evidence establishing that the S&K products Cabasug worked on contained asbestos. For example, Plaintiffs referred the court to the Moore Declaration, which explains the back-and-forth product design process between S&K and the Navy, and asserts that "to the extent that any designs for [S&K] products required the use of asbestos-containing components, the Navy expressly reviewed and approved the use of such components." Doc. No. 677-7, Ametek Ex. F, Moore Decl. ¶ 9. This statement, however, does not address any specific S&K products and therefore does not support the reasonable inference that the products Cabasug

38

worked on contained asbestos.  Plaintiffs also pointed to a technical manual for a

"1200 PSI Pressure Fired Boiler" from the Foster Wheeler Corporation, which was

installed on two of the vessels on which Cabasug worked.  *See* Doc. No. 713-6, Ott

Ex. 4.  Although this technical manual indicates that S&K was listed as the

supplier for Flexitallic gaskets for hydraulic trip valves, as explained above, there

is no evidence that Cabasug worked on hydraulic trip valves.  This manual

therefore fails to support the reasonable inference that Cabasug was exposed to

asbestos provided by S&K.  Thus, viewing the evidence in a light most favorable

to Plaintiffs, the court would be left to speculate whether any of the S&K products

on Cabasug vessels contained asbestos provided by S&K.

Finally, even if S&K initially included asbestos-containing

components in its products, Plaintiffs have failed to raise a genuine issue of

material fact that by the time Cabasug worked on the S&K products, they still

contained asbestos supplied by S&K.  Rather, Plaintiffs again rely on wholly

circumstantial evidence, which simply does not support the reasonable inference

that PHNS ordered asbestos-containing components from S&K to which Cabasug

was exposed.

Specifically, Ott conceded that most of the original component

gaskets and packing associated with S&K products would have been replaced prior

to 1973 when Cabasug began work at PHNS. *See* Doc. No. 677-9, Ametek Ex. H at 416-17. He therefore asserts that "manufacturers such as S&K typically provided additional asbestos gaskets and asbestos packing as on-board repair parts with the initial outfitting," and "routinely and typically supplied repair parts." *See* Doc. No. 713-1, Ott Decl. ¶¶ 37-38; *see also* Doc. No. 713-9, Melvin Wortman Decl. (asserting that fifty percent of the replacement parts obtained by the Puget Sound Naval Shipyard came from the original manufacturer); Doc. No. 713-18, Pls.' Ex. E at 334-35 (Cabasug discussing that Job Material List forms were used to order OEM replacement parts, but providing no testimony regarding S&K in particular). These bare, conclusory assertions -- absent evidence that S&K in fact offered asbestos-containing gaskets for equipment Cabasug worked on -- are insufficient to raise a genuine issue of material fact.

The only concrete evidence Plaintiffs offer on S&K replacement parts is (1) the S&K technical manual titled "Combined Exhaust and Relief Valves for Auxiliary Steam Turbines and Port Feed Pump," which states that "Supply Parts may be ordered directly from [S&K]," Doc. No. 713-19, Pls.' Ex. F at 3276, and lists gaskets as included in the "On Board Repair Parts," *id.* at 3279; (2) an invoice establishing that Bath Iron Works purchased from S&K two gaskets for a hydraulic trip valve, *see* Doc. Nos. 713-6, -7, Pls.' Exs. 4-5; and (3) an invoice establishing

that PHNS ordered from S&K a rotameter with asbestos gaskets for the USS

Reeves.  Doc. No. 713-8, Pls.' Ex. 6.[11]  Again, this S&K manual is unhelpful where

Plaintiffs fail to explain whether it even applies to any vessels or the particular

auxiliary exhaust and relief valves on which Cabasug worked.  Nor are the invoices

helpful -- Plaintiffs failed to establish that Cabasug worked on S&K hydraulic trip

valves (they were present on only two vessels Cabasug worked on, Doc. No. 713-

1, Ott Decl. ¶ 21); and Plaintiffs have never asserted that Cabasug worked on

rotameters.  At most, Plaintiffs' evidence suggests that S&K might have provided

some replacement parts in some limited circumstances.  But this limited evidence

requires too many inferential leaps to conclude that S&K supplied asbestos-

containing repair parts to which Cabasug was exposed.

---

[11]  Plaintiffs further assert that Ametek's corporate witness testified that S&K "on rare occasion . . . supplied repair parts or replacement parts to the Navy."  Doc. No. 712, Pls.' Opp'n at 20 (citing Pls.' Ex. A at 28).  Plaintiffs' Exhibit A does not include a page 28.  But in any event, this testimony supports only that S&K provided replacement parts on occasion, and does not support a reasonable inference that S&K provided asbestos-containing gaskets to PHNS for the equipment on which Cabasug worked.  The court further finds the caselaw that Plaintiffs cite to -- *Grammer v. Advocate Mines, Ltd.*, 2012 WL 7760439 (E.D. Pa. Oct. 17, 2012), and *Abbay v. Armstrong Int'l, Inc.*, 2012 WL 975832 (E.D. Pa. Feb. 29, 2012) -- ultimately unhelpful.  Although these cases are from the MDL court, their discussions of the facts are too brief to provide meaningful guidance.  And in any event, the brief discussion of facts in these cases suggests they have little application here.  *See Grammer*, 2012 WL 7760439 (finding a genuine issue where "Defendant admitted that it 'on some occasions provided small numbers of gaskets and packing to certain customers along with other replacement parts for certain pumps,'" documents established that it sold gaskets, and the instruction manual explained that replacement parts from Defendant should be used); *Abbay*, 2012 WL 975832 (acknowledging that Crane's corporate witness testified that "it also would sell replacement parts sometimes," and Crane produced documents reflecting "multiple sales" of Crane's replacement parts).

In sum, the court finds that when construing the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that Plaintiff was exposed to asbestos from original or replacement gaskets or packing manufactured or supplied by S&K, as any such finding would be impermissibly conjectural.  In particular, the evidence presented fails to raise a genuine issue of material fact that (1) Cabasug was exposed to any S&K products that contained asbestos; or (2) even if the S&K products Cabasug worked on originally contained asbestos, Cabasug was exposed to any asbestos-containing replacement parts provided by S&K.  The court therefore GRANTS Ametek's Motion for Summary Judgment, Doc. No. 676.[12]

///

///

_____

[12] Ametek further requests that the court enter final judgment in favor of Ametek and against Plaintiffs and all Defendants with cross-claims against Ametek.  *See* Doc. No. 676, Ametek Mot. at 3.  The court DENIES this request.  This action presents numerous overlapping legal issues such that entering final judgment at this time would likely lead to an appeals court having to decide issues more than once.  *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (explaining that factors to consider in determining whether to enter a Rule 54(b) judgment include "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals"); *see also* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 3d § 2659 (1998) ("It is uneconomical for an appellate court to review facts on an appeal following a Rule 54(b) certification that it is likely to be required to consider again when another appeal is brought after the district court renders its decision on the remaining claims or as to the remaining parties.").

### 3.      *Aurora Pump's Motion for Summary Judgment, Doc. No. 678*

Plaintiffs assert that Aurora supplied PHNS with various types of pumps containing asbestos gaskets and/or packing, and/or asbestos-containing replacement parts for this equipment.  Doc. No. 661, TAC ¶ 4.  Aurora argues that summary judgment should be granted on Plaintiffs' claims because Plaintiffs have failed to raise a genuine issue of material fact that Cabasug was exposed to any asbestos from an Aurora pump.

As an initial matter, the court finds that Plaintiffs have raised a genuine issue of material fact that Cabasug was exposed to Aurora pumps, and in particular their gaskets, while working at PHNS.  Cabasug asserts in his interrogatory responses that he recalls "working on many [Aurora] pumps," which included "all types of pumps."  Doc. No. 711-43, Pls.' Ex. B at No. 18.  Cabasug further explained during his deposition that in general he was involved in the overhaul of pumps, which involved removal and replacement of insulation, gaskets, and packing.  *Id.*; *see also* Doc. No. 711-45, Pls.' Ex. D at 384-86.  Although Cabasug did not provide specifics regarding which types of Aurora pumps he worked on and on which vessels (other than stating that he especially recalled working on the "main feed pumps," *see* Doc. No. 711-43, Pls.' Ex. B at No. 18), Ott explains that Aurora provided "at least 198 pumps for at least 19 of

the ships and submarines on which Mr. Cabasug worked," and that these pumps covered a broad range "in terms of size, capacity, operating pressure and temperatures, and function."  Doc. No. 711-12, Ott Decl. ¶ 13.

The court further finds that Plaintiffs have raised a genuine issue of material fact that the gaskets and packing contained within Aurora pumps aboard vessels Cabasug worked on were comprised of asbestos.  For example, technical manuals for Type GNC pumps, the main category of end suction pumps, *see* Doc. No. 711-14, Ott Ex. 2 at 36, disclose the use of asbestos gaskets and packing, indicate that additional asbestos packing was included as on-board spare parts, and provide individual Aurora Service Part Numbers to order replacements gaskets. *See* Doc. No. 711-15, Ott Ex. 3; Doc. No. 711-16, Ott Ex. 4; Doc. No. 711-30, Ott Ex. 18; *see also* Doc. No. 711-12, Ott Decl. ¶¶ 18-23.  Ott asserts that he reviewed eight Aurora technical manuals for Type GNC pumps related to the time frame in which the vessels on which Cabasug worked were built, and that they all disclose the exclusive use of asbestos packing and gaskets.  *See* Doc. No. 711-12, Ott Decl. ¶¶ 19-20.[13]  As another example, technical manuals for turbine-driven pumps show

_____

[13]  These asbestos gaskets are within the pumps, and Ott conceded that no evidence indicates that Aurora sold asbestos-containing flange gaskets, portable pads, or insulation. *See* Doc. No. 734-1, Aurora Ex. A at 321.

Aurora nonetheless argues that Ott cannot link the absestos gaskets described in the technical manuals to the particular pumps Cabasug might have worked on given that the manuals

(continued...)

that they included 33 asbestos gaskets and that Aurora offered onboard repair parts and spare parts.  Doc. No. 711-18, Ott Ex. 6; Doc. No. 711-21, Ott Ex. 9; *see also* Doc. No. 711-12, Ott Decl. ¶¶ 34-36.  These turbine-driven pumps were aboard two of Cabasug's vessels.  Doc. No. 711-12, Ott Decl. ¶ 36.

Finally, although there appears to be no dispute that the gaskets for these pumps were routinely removed and replaced, Plaintiffs have provided evidence that Aurora provided asbestos-containing replacement parts to which Cabasug was exposed.  As described above, technical manuals establish that Aurora included on-board repair parts that included asbestos.  Further, Ott asserts that the Navy's standard practice was to obtain repair parts from the original equipment manufacturer.  *Id.* ¶ 58; *see also* Doc. No. 711-45, Pls.' Ex. D at 334-35 (Cabasug discussing that Job Material List forms were used to order OEM replacement parts).

Although Ott's generalized assertions regarding Navy practice are insufficient on their own to raise a genuine issue, Ott provides factual support for

---

[13](...continued)
were not for the specific Cabasug vessels.  *See* Doc. No. 734, Aurora Reply at 8-9.  The court rejects this argument -- Ott asserts that he reviewed eight Aurora technical manuals for Type GNC pumps (whereas Ott's deposition testimony provided by Aurora addresses only three, *see* Doc. No. 734-1, Aurora Ex. A), and according to Ott, all of them disclose the use of asbestos gaskets and packing.  *See* Doc. No. 711-12, Ott Decl. ¶¶ 19-20.  This evidence is sufficient to raise the reasonable inference that Aurora used asbestos in its Type GNC pumps, which were present on Cabasug vessels.

the reasonable inference that PHNS obtained replacement gaskets from Aurora --

according to Ott, Aurora's technical manuals did not provide sufficient technical

information for others to manufacturer the repair parts, and the precise dimensions

and thickness of gasketing material was proprietary information held by Aurora.

Doc. No. 711-12; Ott Decl. ¶¶ 55-56; Doc. No. 711-27, Ott Ex. 15.  Viewed in a

light most favorable to Plaintiffs, this evidence -- combined with the facts that

Aurora's corporate representative testified that it was part of Aurora's business to

keep asbestos-containing replacement gaskets and packing in inventory for its

customers, Doc. No. 711-48, Pls.' Ex. F, and PHNS ordered some asbestos-

containing gaskets for at least one vessel on which Cabasug worked, Doc. No. 711-

27, Ott Ex. 15[14] -- supports the reasonable inference that Cabasug was exposed to

asbestos gaskets supplied by Aurora.

But to the extent that Plaintiffs assert that Aurora is liable for the

external insulation applied to its pumps, the court rejects such argument as

unsupported in law and fact.  All the evidence presented suggests that Aurora did

not supply external insulation.  *See* Doc. No. 679-5, Aurora Ex. D at 321.  As a

---

[14] In Reply, Aurora argues that Ott was unable to identify for each Aurora purchase order the particular vessel to which it applied and therefore failed to establish that any Aurora replacement parts were aboard Cabasug vessels.  *See* Doc. No. 734, Aurora Reply at 9-10.  This argument ignores Ott's Exhibit 15, as well as the fact that a reasonable inference can be drawn from the other evidence presented.

result, the fact that Aurora's products were later insulated with asbestos is insufficient to hold Aurora liable for asbestos it did not manufacture or distribute.

In sum, viewed in a light most favorable to Plaintiffs, there is ample evidence supporting the reasonable inference that Cabasug was exposed to asbestos gaskets from Aurora pumps, including that (1) Cabasug testified that he replaced gaskets from pumps and that he recalled working on Aurora pumps; (2) there were 198 Aurora pumps aboard 19 different vessels upon which Cabasug worked; (3) Aurora included asbestos gaskets in its pumps; (4) Aurora provided on-board repair parts containing asbestos and also kept replacement parts in inventory; (5) the dimensions of the gaskets were proprietary information, suggesting that other manufacturers could not easily provide replacement parts; and (6) PHNS ordered gaskets from Aurora.[15]  And Aurora offers no direct evidence that it did not include asbestos gaskets in its products and/or did not provide replacement gaskets, instead merely relying on evidentiary gaps apparently caused by the

_____

[15]  Aurora did not argue in its initial Motion that Plaintiffs failed to establish that Cabasug's exposure to Aurora gaskets was a substantial factor in causing Plaintiffs' injuries. Although Aurora argues in Reply that "Plaintiffs need to show that the gasket or packing would have been manipulated near Mr. Cabasug in such a way as to release asbestos dust he breathed," the court does not address arguments raised for the first time in reply.  *See, e.g.*, *Hi-Tech Rockfall Const., Inc. v. Cnty. of Maui*, 2009 WL 529096, at *18 n.9 (D. Haw. Feb. 26, 2009) ("Local Rule 7.4 provides that '[a]ny arguments raised for the first time in the reply shall be disregarded.'"); *Coos Cnty. v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008) (declining to consider an argument raised for the first time in a reply brief).

decades that have passed since Cabasug worked at PHNS.  The court therefore

DENIES Aurora's Motion for Summary Judgment as to asbestos gaskets, and

GRANTS the Motion for Summary Judgment as to flange gaskets, portable pads,

and external insulation.  *See supra* n.13.

### 4.    *Crane's Motion for Summary Judgment, Doc. No. 690*

Plaintiffs assert claims against Crane based on its manufacture and

supply to PHNS of valves containing asbestos gaskets and/or packing, and/or

asbestos-containing replacement parts for this equipment.  Doc. No. 661, TAC ¶ 4.

Crane argues that Plaintiffs have failed to raise a genuine issue of material fact that

Cabasug was exposed to any asbestos that Crane placed into the stream of

commerce, or that such asbestos caused Plaintiffs' injuries.

As an initial matter, there is no dispute that Cabasug worked on Crane

valves during his tenure at PHNS -- he testified that he worked on and observed

others working on Crane valves "very routinely and regularly" while at PHNS,

Doc. No. 691, Crane CSF ¶ 3, and that his job duties included replacing the

internal gaskets and packing contained within the valves.  *See* Doc. No. 724-4,

Pls.' Ex. C at 26-29.  According to Conrad Palafox, one of Cabasug's co-workers,

Crane valves were "on every ship" at PHNS.  Doc. No. 724-2, Pls.' Ex. A at 109.

Ott also opines that Crane is "one of the largest suppliers of valves and valve

48

replacement parts to the Navy, and that Crane sold an "extensive array of valve and valve parts" for thirty-four Cabasug vessels.  Doc. No. 724-15, Ott Decl. ¶ 14.

Plaintiffs have also presented evidence that Cabasug worked on Crane valves containing asbestos gaskets and packing.  Although the Navy specified the use of both asbestos containing and non-asbestos containing materials for gaskets, *see* Doc. No. 691-4, Crane Ex. C at 9, Ott explains that the steam piping systems of steam vessels "required the use of asbestos gaskets to seal the mechanical bonnet joints [and] asbestos packing to seal valve systems from leakage," Doc. No. 725-15, Ott Decl. ¶ 17, and that many of the vessels Cabasug worked on included these high-pressure steam valves with asbestos components.  *Id.* ¶¶ 25-31.  Given that Cabasug testified that he worked on steam valves, *see* Doc. No. 724-4, Pls.' Ex. C at 28, this evidence supports the reasonable inference that Cabasug worked on Crane valves containing asbestos components.

Plaintiffs have also presented evidence that Cabasug was exposed to replacement gaskets and packing containing asbestos provided by Crane.  Crane technical manuals show that Crane provided on-board repair parts containing asbestos with the original sale of the valves, *see* Doc. No. 723-23, Ott Ex. 7; Doc. Nos. 723-50 - 723-53, Ott Exs. 31-33, and Crane advertised its ability to "provide the exact replacement match, based on original specifications."  Doc. No. 724-31,

49

Ott Ex. 12.  Further, both Ott and Cabasug assert that it was the preferred practice to order replacement parts from the original manufacturer, Doc. No. 724-6, Pls.' Ex. D at 270-71, Doc. No. 725-15, Ott Decl. ¶ 52, and Ott asserts that Crane's technical manuals did not provide sufficient technical information for others to manufacture the replacement parts.  Doc. No. 724-15; Ott Decl. ¶ 63.  That PHNS obtained replacement parts from Crane is confirmed by evidence that (1) the Navy's Ships Parts Control Center purchased 7,021 gaskets and 1,232 packing rings, which the Navy would keep as back inventory and distribute to various shipyards, *see* Doc. No. 724-15, Ott Decl. ¶ 61; Doc. No. 724-37, Ott Ex. 18; and (2) material inspection and laboratory service requests show that PHNS purchased Crane asbestos replacement parts for Cabasug vessels.  *See* Doc. No. 724-15, Ott Decl. ¶¶ 56-60 (discussing Ott Exs. 10, 21, 22 to explain that these material inspection and laboratory service requests were for asbestos components and for vessels on which Cabasug worked).  Viewed in a light most favorable to Plaintiffs, this evidence supports the reasonable inference that Cabasug was exposed to asbestos gaskets and/or packing provided by Crane.

Finally, Plaintiffs have presented evidence that this exposure was a substantial factor in causing Plaintiffs' injuries.  As opined by Plaintiff's expert William E. Longo, Ph.D, the removal of gaskets and packing from steam

equipment creates airborne asbestos dust.  Doc. No. 724-10, Pls.' Ex. H at 26-30.

And according to another of Plaintiffs' experts, Richard Lemen, Ph.D., all sources

of asbestos exposure increase the individual's risk of developing an asbestos-

related disease, including mesothelioma.  Doc. No. 724-9, Pls.' Ex. G, Lemen

Decl. ¶¶ 20, 22.[16]  Thus, the evidence presented supports the reasonable inference

that Cabasug was exposed to respirable asbestos fibers from Crane products, and

that such exposure was a substantial factor in causing Cabasug's injuries.

        In opposition, Crane argues that even if there is a question of fact

whether Cabasug encountered an asbestos-containing gasket or piece of packing

placed into the stream of commerce by Crane, there is no evidence establishing

how routinely he encountered asbestos-containing materials supplied by Crane as

opposed to by others.  *See* Doc. No. 733, Crane Reply at 6-7.  According to Crane,

such evidence is necessary to establish substantial exposure over a substantial

period of time as required by *Lindstrom*.  Again, the court rejects that Plaintiffs

---

[16]  The court's reliance on the Lemen Declaration is not contrary to *Lindstrom*, which rejected that an expert declaration opining in "conclusory fashion that every exposure to asbestos was a substantial factor in Lindstrom's illness" was sufficient to defeat summary judgment. *See* 424 F.3d at 493.  *Lindstrom* reasoned that "[a] holding to the contrary would permit imposition of liability on the manufacturer of any product with which a worker had the briefest of encounters on a single occasion."  *Id.*  Unlike in *Lindstrom*, the court finds that evidence that Cabasug was exposed to asbestos from a particular Defendant's product, combined with expert testimony that such exposure is sufficient to contribute to asbestos-related diseases, is sufficient to raise a genuine issue of material fact that the product was a substantial factor in causing Plaintiffs' injuries.

must come forward with direct evidence establishing some magic number of exposures to survive summary judgment.  Indeed, Crane's argument ignores that *Lindstrom* does not define what substantial, as opposed to minimal, exposure means.  Rather, as this court explained above, context matters.

And viewed in a light most favorable to Plaintiffs, the court finds that the evidence supports a reasonable inference that asbestos-containing components supplied by Crane were a substantial factor in causing Plaintiffs' injuries where: (1) Crane valves were prevalent throughout Cabasug vessels; (2) Cabasug worked on Crane valves "very routinely and regularly" by replacing the internal gaskets and packing contained within the valves; (3) Cabasug worked on Crane steam valves, which required and included asbestos components; (4) Crane advertised its ability to provide replacement parts; (5) the Navy had a preferred practice to order replacement parts from the original equipment manufacturer; (6) Crane did not provide sufficient technical information for others to manufacturer the replacement parts; (7) PHNS purchased Crane asbestos replacement parts for Cabasug vessels; (8) Cabasug's work on valves created airborne asbestos dust; and (9) each exposure to respirable asbestos fibers increases the risk of contacting mesothelioma.  In other words, this evidence suggests that Cabasug was exposed to some number of Crane replacement parts containing asbestos and that such

exposure was a substantial factor in causing Plaintiffs' injuries.

The court therefore DENIES Crane's Motion for Summary Judgment as to the gaskets and packing provided by Crane.  To the extent Plaintiffs asserted any claims on external insulation, however, there is no evidence that Crane provided such components.  The court therefore GRANTS Crane's Motion as to any external insulation.

### 5. *Cleaver Brooks' Motion for Summary Judgment, Doc. No. 674*

Plaintiffs assert claims against Cleaver Brooks based on its former parent company, Aqua Chem, Inc.'s manufacture and supply to PHNS distilling plants, including their various components.  *See* Doc. No. 661, TAC ¶ 4.  Cleaver Brooks argues that summary judgment should be granted on Plaintiffs' claims because Plaintiffs have failed to raise a genuine issue of material fact that Cabasug was exposed to any asbestos that Aqua Chem placed into the stream of commerce.

Viewing the evidence in a light most favorable to Plaintiffs, the court finds that Plaintiffs have established a genuine issue of material fact that Cabasug was exposed to Aqua Chem distilling plants.  According to Ott, there were a total of twenty-one Aqua Chem distilling plants on eleven of the vessels on which Cabasug worked.  Doc. No. 718-1, Ott Decl. ¶ 15.  Cabasug has asserted in both his interrogatory responses and his deposition testimony that he specifically

recalled working on Aqua Chem distillers.  For example, in Plaintiffs' January 31, 2013 Amended Answer to Interrogatories, Cabasug stated that he worked on Aqua Chem distillers, explaining that he "did a lot of work on all parts of the distillers, including the associated piping and valves, all of which involved the removal and replacement of the insulation and the gaskets and packing."  Doc. No. 718-33, Pls.' Ex. 3 at 10.  And during his February 27, 2013 deposition, Cabasug testified that he worked on Aqua Chem distillers by replacing their gaskets and packing, that an overhaul would take four to six months, and that he performed this overhaul work "routinely and regularly."  Doc. No. 718-31, Pls.' Ex. 1 at 373-75.  This testimony is echoed by Cabasug's former supervisor, Richard Felimer, who asserts that they spent forty-percent of their time overhauling Aqua Chem distillers, and that Cabasug, Felimer, and other coworkers were part of a "cooler gang" that was repeatedly given this work maintaining distillers.  Doc. No. 718-10, Ott Ex. 6, Felimer Decl. ¶¶ 3-4.

Plaintiffs have also presented evidence that these distillers contained asbestos components.  Both Ott and Felimer explained that these distillers contained asbestos components including insulation, packing, and gaskets, *see* Doc. No. 718-1, Ott Decl. ¶¶ 18-23, Doc. No. 718-10, Ott Ex. 6, Felimer Decl. ¶¶ 8, 10, 12, and Cleaver Brooks' technical manuals confirm this assertion.  *See,*

54

*e.g.*, Doc. Nos. 718-3 - 718-5, Ott Exs. 2-4.

Finally, Plaintiffs have presented evidence which raises the reasonable inference that the asbestos components to which Cabasug was exposed were supplied by Aqua Chem and/or Cleaver Brooks.  Although the original asbestos components may have been replaced by the time Cabasug started working at PHNS, Ott, Felimer, and Cabasug all assert that it was standard practice for the Navy (and PHNS in particular) to order replacement parts from the original equipment manufacturer.  *See* Doc. No. 718-1, Ott Decl. ¶ 25(d); Doc. No. 718-10, Ott Ex. 6, Felimer Decl. ¶¶ 13-14; Doc. No. 718-31, Pls.' Ex. 1 at 37.  And there appears to be little dispute that Cleaver Brooks offered replacement parts -- Cleaver Brooks provided instructions in its technical manuals for ordering replacement parts from Cleaver Brooks, *see* Doc. No. 718-1, Ott Decl. ¶ 25(e), (f); Doc. No. 718-7, Ott Ex. 3 (technical manual); and Cleaver Brooks' corporate representative testified that Cleaver Brooks provided these instructions with the hope that customers would order from Cleaver Brooks, and that "Cleaver Brooks has always sold replacement gaskets."  Doc. No. 718-41, Pls.' Ex. 10 at 44, 69; *see also* Doc. No. 718-42, Pls.' Ex. 11 at 46 (admitting that Cleaver Brooks sold asbestos-containing gaskets as replacement parts); Doc. No. 718-9, Ott Ex. 5 (purchase orders for replacement gaskets from Cleaver Brooks by Bath Iron

Works).  Indeed, Cleaver Brooks offers no evidence suggesting that it did not sell replacement gaskets as a regular part of its business.  Viewed in a light most favorable to Plaintiffs, this evidence supports the reasonable inference that Cabasug was exposed to asbestos components that were supplied by Aqua Chem and/or Cleaver Brooks.

In opposition, Cleaver Brooks argues that the court should disregard Cabasug's and Felimer's testimony that Cabasug worked extensively on distillers as "sham testimony" in contradiction of their earlier statements.  *See* Doc. No. 747, Cleaver Brooks Reply at 10-12.  As to Cabasug, Cleaver Brooks asserts that Cabasug's recent testimony regarding distillers contradicts (1) his first deposition on December 3, 2013 in which he never described that his work at PHNS involved distillers, *see* Doc. No. 747-4, Cleaver Brooks Ex. C (mentioning the word "distiller" only once); and (2) paperwork called "Standard Form 171s" that Cabasug filled out at PHNS from 1973 through 1975, and in which he described his work as a pipefitter yet never mentioned distillers.  *See* Doc. Nos. 747-2, 747-3, Cleaver Brooks Exs. A-B.  As to Felimer, Cleaver Brooks asserts that his testimony contradicts: (1) Felimer's interrogatory responses he provided in his own asbestos products liability action in which failed to mention any work on distillers, Doc. No. 747-5, Cleaver Brooks Ex. D; and (2) Felimer's Standard Form 171

56

signed on February 10, 1979 and describing his work from 1966 to 1979, which

does not mention any work on distillers despite listing a number of "pertinent

machinery" on which he worked. Doc. No. 747-6, Cleaver Brooks Ex. E.  Cleaver

Brooks further asserts that Cabasug's and Felimer's testimony contradicts

assertions by other Shop 56 pipefitters, who never named any distiller

manufacturers in their asbestos actions and never asserted they did any work on

distillers.  *See* Doc. Nos. 747-8 - 747-11, Cleaver Brooks Exs. G-J (Conrad Palafox

and Clifford Mattos).

Although this evidence certainly calls into question the credibility of

Felimer's and Cabasug's recent assertions that Cabasug worked on distillers, the

sham testimony rule applies in limited circumstances.  *Yeager v. Bowlin*, 693 F.3d

1076, 1080 (9th Cir. 2012), recently explained that this rule:

> prevents "a party who has been examined at length on
> deposition" from "rais[ing] an issue of fact simply by
> submitting an affidavit contradicting his own prior
> testimony," which "would greatly diminish the utility of
> summary judgment as a procedure for screening out sham
> issues of fact." [*Kennedy v. Allied Mut. Ins. Co.*, 952
> F.2d 262, 266 (9th Cir. 1991)] (internal quotation marks
> omitted); *see also* [*Van Asdale v. Int'l Game Tech.*, 577
> F.3d 989, 998 (9th Cir. 2009)] (stating that some form of
> the sham affidavit rule is necessary to maintain the
> principle that summary judgment is an integral part of the
> federal rules).  But the sham affidavit rule "'should be
> applied with caution'" because it is in tension with the
> principle that the court is not to make credibility

determinations when granting or denying summary judgment. *Id*. (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993)).  In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id*. at 998-99.

Applying this framework, much of the evidence Cleaver Brooks points to as contradicting Cabasug's and Felimer's recent statements regarding distillers is not the proper subject for the sham affidavit rule.  The rule applies where a party's affidavit, submitted to oppose summary judgment, contradicts that party's prior deposition testimony.  *Id.*  The rule does not extend to statements made by the parties outside the context of litigation, much less to statements made to those other than the declarant.  Weighing such evidence -- in this case, the Standard Form 171s and statements of other coworkers -- is the province of the jury, not the judge.  *See Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009) ("[W]e decline to extend our sham affidavit jurisprudence to preclude the consideration of testimony from third parties that is arguably inconsistent with a party's own testimony.").

As to Felimer, he is not a party in this action, and by its plain terms the sham affidavit rule applies where a *party* provides conflicting testimony to

avoid summary judgment.  Generally, third parties such as Felimer are not

motivated to create "sham" testimony such that conflicts in third-party testimony

are for the jury to resolve.  *See Lane v. Celotex Corp.*, 782 F.2d 1526, 1530 (11th

Cir. 1986) (refusing to apply sham affidavit rule to third party testimony because

although "a district court may find that a party's contradictory affidavit constitutes

a sham . . . we would be unable, absent great trepidation, to affirm a similar finding

with respect to a disinterested witness' contradictory affidavit").  But even if the

court applied the sham affidavit rule to Felimer, his interrogatory responses in his

own asbestos action are not detailed such that the court cannot determine whether

they were intended to be a full and complete description of all work he performed

on all types of equipment at PHNS.  As a result, his interrogatory responses do not

create a clear and unambiguous inconsistency with his later deposition testimony

and declaration in this action.

Finally, as to Cabasug, it is true that Cabasug did not mention his

work on distillers during his first deposition.  But it is also true that Cabasug was

not specifically asked about his work on distillers, and the court cannot discern

whether Cabasug was asked at this first deposition to otherwise describe all work

on all equipment he did at PHNS.  The sham affidavit rule applies where there is a

clear inconsistency in testimony, not where the possibility of memory lapses exists.

59

Given these gaps and open questions, the inconsistency with Cabasug's later

deposition testimony and interrogatory responses is not so clear and unambiguous

to justify striking this evidence under the sham affidavit rule.

In sum, the court finds that a reasonable inference may be drawn that

Cabasug was exposed to asbestos gaskets and packing from Aqua Chem and/or

Cleaver Brooks based on the evidence that: (1) Cabasug specifically recalled

working on Aqua Chem distillers by replacing their gaskets and packing; (2) both

Ott and Felimer assert that the gaskets and packing of the distillers contained

asbestos; (3) Cleaver Brooks provided instructions for ordering replacement parts;

and (4) selling replacement parts, including asbestos gaskets, was a regular part of

Cleaver Brooks' business.  The court therefore DENIES Cleaver Brooks' Motion

for Summary Judgment.

## V.  <u>CONCLUSION</u>

Based on the above, the court: (1) DENIES Defendant

Cleaver-Brooks, Inc.'s Amended Motion for Summary Judgment, Doc. No. 674;

(2) GRANTS Defendant Ametek Inc.'s Motion for Summary Judgment, Doc. No.

676; (3) GRANTS in part and DENIES in part Defendant Aurora Pump

Company's Motion for Summary Judgment, Doc. No. 678; (4) DENIES Plaintiffs'

Motion for Summary Adjudication on the Duty to Warn Under Maritime Law,

Doc. No. 683; and (5) GRANTS in part and DENIES in part Crane Company's

Motion for Summary Judgment, Doc. No. 690.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 26, 2013.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Cabasug et al. v. Crane Co. et al.*, Civ. No. 12-00313 JMS/BMK, Order Addressing Various Motions for Summary Judgment Raising Issues of Causation and the Duty to Warn (Doc. Nos. 674, 676, 678, 683, and 690)